## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| ROEHL TRANSPORT, INC., a Wisconsin Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-653 |
| | ) | **COMPLAINT** |
| v. | ) ) | |
| ADAM STEIN, an individual, and OMNI SPECIALIZED, LLC, a Nevada Limited Liability Company, | ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff Roehl Transport, Inc. for its Complaint against Defendants Adam Stein and

Omni Specialized, LLC (collectively, "Defendants") states as follows:

### PARTIES

1.     Roehl Transport, Inc. ("Roehl") is a Wisconsin corporation with its principal

place of business located in Marshfield, Wisconsin.

2.     Adam Stein ("Stein"), upon information and belief, resided in Wisconsin at all

times relevant to this Complaint.  Upon further information and belief, Stein resides at 3701

Roberts Place, Apt. 209, Stevens Point, Wisconsin 54481.

3.     Upon information and belief, Omni Specialized, LLC ("Omni") is a Nevada

limited liability company with its principal place of business located at 20812 E. 550th Street,

Colona, Illinois 61241.  Upon further information and belief, Omni conducts business in

Wisconsin.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because Roehl asserts causes of action under federal law.  Specifically, Roehl asserts causes of action under: (i) the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*, and (ii) the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) based on the following:

   a.   Defendant Stein resides in Portage County, Wisconsin;

   b.   Defendant Omni conducts, engages in, and carries on business within the Western District of Wisconsin; and

   c.   The unlawful acts giving rise to Plaintiff's claims occurred in Wood County, Wisconsin.

## FACTUAL BACKGROUND

### I.     Roehl's Trucking Operations and Its Protection of Confidential Information

6.      Roehl is a national transportation services company that offers trucking solutions and logistics to various types of customers throughout the United States.  Roehl operates private fleets for its customers in order to serve their long-haul and short-term transportation needs.  In addition to dry van services, Roehl offers flatbed, curtainside, heavy haul, refrigerated and logistics capabilities to its customers.

7.      Roehl is one of the 100 largest trucking companies in the United States with more than 1,900 tractors and 5,200 trailers in operation.  Roehl integrates its customers' critical production and supply-chain requirements into its trucking operations in order to improve its customers' business needs and enhance customer satisfaction.

8.     While Roehl is headquartered in Wisconsin, it services customers nationally with terminals and drop yards from coast to coast.  Roehl offers trucking services to forty-eight (48) States and is licensed to do business in all Canadian territories.

9.     Roehl employs approximately 2,000 professional truck drivers across the country.

10.     Over the course of several years, Roehl has developed unique business plans for trucking solutions and operations that are the primary key to its growth and success in this highly competitive industry.  Roehl has invested a great deal of time and money in the creation and refinement of a specialized platform for training and monitoring its drivers, optimizing trucking routes, and crafting tailored solutions for customers that outsource their transportation and/or logistics needs to Roehl.  As a result, Roehl has developed a reputation for high performance, efficiency, reliability and customer satisfaction.

11.     One of the most important factors essential to Roehl's success is identifying and developing highly talented employees who will contribute to the success and fulfillment of Roehl's corporate mission.  For example, in order to ensure that its drivers are safe, conscientious and efficient in completion of their duties, Roehl carefully tracks a variety of metrics related to the performance and productivity, *e.g.*, on-time deliveries, miles per-gallon, traffic and toll road violations, etc.

12.     To facilitate the generation and analysis of this confidential data, Roehl employs dozens of fleet managers throughout the country in order to effectively monitor its drivers and ensure that the company's trucking operations run safely and efficiently.

13.     Additionally, Roehl has spent years developing its own confidential systems that output detailed data metrics and enable Roehl to regularly monitor its trucking operations.  For example, Roehl maintains comprehensive information regarding its fleet managers and truck

drivers' performance in a confidential Microsoft SQL database. Roehl tracks a myriad of statistics in this database relating to the performance details of each of its fleet managers, including, *inter alia*, annualized driver turnover, fleet size, fleet productivity, revenue generated and traffic violations committed by drivers.

14.     Direct access to Roehl's Microsoft SQL database is highly restricted. The only individuals at Roehl with direct access to the Microsoft SQL database are the database administrator, Roehl's Vice President of Technology and his IT team, and Roehl's financial analyst who has limited access for the purpose of analyzing financial trends.

15.     Access to this operational data is dictated by each employee's Microsoft Active Directory profile which is carefully administered through Roehl's Active Directory Domain Services. Microsoft Active Directory Domain Services is Roehl's security network that controls login credentials and restricts the type of information to which employees have access in the regular course of business. Microsoft Active Directory Domain Services also provides security and authentication for employees to access their own Microsoft Exchange email account. In order to access the Microsoft Active Directory network, a Roehl employee must input his or her unique username and password. Roehl has a robust password-protection policy that requires employees to change their passwords every 90 days and use passwords that meet minimum strength and recycling requirements.

16.     After logging into the Microsoft Active Directory network, managerial employees have the ability to view operational data stored in Roehl's Microsoft SQL database by accessing Roehl's Business Intelligence Center ("MyBIC"). The MyBIC portal groups operational reports by category (*e.g.*, driver performance, capacity management, productivity, etc.) and enables

certain Roehl employees to generate computerized reports that aggregate and summarize data based on parameters inputted by an employee.

17.     An employee's ability to generate reports in the MyBIC portal depends on that employee's official job position and the scope of confidential information to which that employee is allowed to have access.  Roehl assigns employees to "reporting groups" based on the employee's role and job responsibilities.  Membership in these reporting groups controls the types of reports that are visible to employees when they use the "MyBIC" reporting portal.  Each reporting group also creates (as needed) additional controls and security restrictions to limit the types of data to which the employee running a report has access.

18.     In his capacity as a Fleet Operations Manager for Roehl, Stein  had the ability to run operations-based reports that provided him with complete access to confidential company data concerning the management and productivity of the fleet managers under his control going back several years.

19.     The identities of Roehl's fleet managers and truck drivers are not publicly known or ascertainable.  Nor is Roehl's logistical data relating to its day-to-day trucking operations. Instead, this information is kept secret and is only accessible to Roehl's managerial employees— via the MyBIC—depending on their official job duties.

20.     In addition, all personal mobile devices, including iPhones, Androids and tablets that employees use to access Roehl's confidential information are also required to be password-protected.

21.     Due to the nature of the trucking industry and the premium that customers place on driver safety and the timely delivery of goods to destinations throughout the United States and Canada, goodwill and the maintenance of a reliable workforce of fleet managers and drivers are

critical components of Roehl's business and its success.  When Roehl allows its managers and directors access to confidential logistics data, Roehl trusts those persons with access to a highly cultivated data created through proprietary processes that were developed and utilized by Roehl in the regular course of business over the course of several decades.

22.     Roehl requires all management, administrative and sales employees to agree to certain restrictions and obligations promising that they will not disclose confidential information, including trade secrets, without prior written authorization from an officer of the company.  Such confidential information includes, but is not limited to, present or prospective customer lists, vendor information, customer requirements, methods of operation, computer-generated reports, pricing policies, business plans, marketing plans, and employee information, including performance and compensation.

## II.     Defendant Stein's Role with Roehl and His Post-Employment Obligations

23.     Stein served as Fleet Operations Manager for Roehl.  In this capacity, Stein worked directly with fleet managers.  Ten (10) fleet managers reported directly to Stein, who managed and oversaw approximately 550 truck drivers.

24.     As Fleet Operations Manager, Stein was responsible for monitoring fleet managers and ensuring that their truck drivers followed company policies and procedures relating to the prompt and safe delivery of customers' goods.  Specifically, Stein was responsible for coaching and training fleet managers on safety precautions, accident prevention, how to improve driver performance, and resolution of customer complaints and other operational issues. In short, Stein was the leader of his group of fleet managers and the point person for making sure that trucking operations under his watch ran smoothly and as efficiently as possible.

25.     Stein's main office at Roehl was located at Roehl's corporate headquarters in Marshfield, Wisconsin.

26.     Stein's immediate supervisor at Roehl was Mitch LeGrand, whose official title is Director of Operations.

27.     In his role as Fleet Operations Manager, Stein had direct and regular access to the MyBIC portal in the course of his job duties.   This access enabled him to view confidential company data that included information regarding driver performance, driver attrition rates, productivity reports for individual drivers, and the performance of all fleet managers at Roehl.

28.     In connection with Stein's employment with Roehl and the provision of confidential information associated with his employment, Stein agreed to certain post-employment restrictions and obligations contained in Roehl's Employee Handbook.

29.     Specifically, the Employee Handbook prohibits Stein from disclosing confidential information.  In pertinent part, it provides:

> A.  **Confidential Information**.  All of our records are confidential and may not be copied or disclosed without prior written authorization from an officer of the company.  For purposes of this policy, "confidential information" shall be defined as information that (1) constitutes a trade secret under the Uniform Trade Secrets Act, Sec. 134.90, Wis. Stats.; (2) is proprietary to the Company; and/or (3) is not generally known to others in the Company's industry.  Confidential information shall include, but not be limited to, present or prospective customer lists, vendor information, customer requirements, methods of operation and/or management, computer-generated reports, pricing policies and/or formulas, operation methods, business plans or strategies, marketing plans, applications of technology and computer systems, business processes and/or procedures, employee compensation and/or incentive programs, sales plan, and any information concerning company's business plans.
>
> B.  **Computers and Office Technology – System Usage**.  You are responsible for maintaining the confidentiality of information related to customers and the company. This information is not

> to be misused or distributed as this may be detrimental to the
> company or a violation of state or federal law.

30.     The relevant excerpts of Roehl's Employee Handbook are attached hereto as Exhibit A.

31.     At the beginning of Stein's employment with Roehl on or about July 23, 2012, Stein signed a written Employee Acknowledgment of the Employee Handbook.

32.     Stein's Employee Acknowledgment form is attached hereto as Exhibit B.

**III.     Omni Specialized, LLC**

33.     Omni is a Nevada limited liability corporation, and according to the Nevada Secretary of State, was organized on February 19, 2016.

34.     According to the Nevada Secretary of State, Omni has three officers: Earl Coleman, Donald Orr and Thomas Witt.  Upon information and belief, Thomas Witt ("Witt") is the President of Omni.

35.     Omni is a trucking company offering the same services and transportation solutions as Roehl.  According to Omni's website, it "is one of the largest over-dimensional and general commodity carriers serving all 48 states."

36.     Prior to Witt's involvement with Omni, he served as the President of Roehl.  Witt resigned from Roehl on February 16, 2016.

37.     Upon information and belief, while Witt was still President of Roehl he served as a consultant to the company that would later become Omni.  Witt did not disclose these activities to anyone at Roehl.

38.     Upon information in belief, Witt and a group of investors (including Coleman and Orr) purchased Omni in May 2016.

39.     During the week of August 8, 2016, Stein told his supervisor, Mitch LeGrand, that Witt had solicited Stein to come work for Omni as a fleet operations manager.  Upon information and belief, during this conversation between Witt and Stein, Witt told Stein that Omni had underperforming fleet managers.

40.     Upon information and belief, after Witt became President of Omni in May of 2016, he began actively recruiting Stein, and possibly others, to leave Roehl and join Omni.

## IV.     Stein's Misappropriation of Roehl's Confidential Trade Secrets Immediately Before His Resignation from the Company

41.     In August, 2016, Stein decided to leave Roehl and join Omni as a fleet operations manager.  Upon information and belief, Witt encouraged Stein to steal confidential information and trade secrets from Roehl prior to Stein's departure from the company.

42.     On Sunday, August 28, 2016, Stein forwarded at least four (4) emails from his work account to his personal Gmail account (astei217@gmail.com) with attachments containing a plethora of confidential company information.  Upon information and belief, the vast majority of these attachments were obtained as a result of Stein accessing and generating reports from Roehl's MyBIC portal.

43.     Forensic review of Stein's email account reveals the exact files that he sent to himself.  Roehl archives all emails sent and received on Roehl's servers in the regular course of business using the Barracuda email archive solution.  Every email that flows in or out of a Roehl mailbox is automatically stored in Barracuda in the regular course of business.

44.     At 7:29 p.m. CDT on August 28, 2016, Stein sent an email to his personal Gmail account containing six Microsoft Excel spreadsheets as attachments.  The attached Excel spreadsheets contained detailed driver metric data for drivers' activities in 2015 and 2016.

Among other things, the Excel spreadsheets tracked drivers' monthly performance, evaluation of trucking routes taken by drivers, and traffic violations for driver fleets managed by Stein.

45.     At 7:30 p.m. CDT on August 28, 2016, Stein sent an email to his personal Gmail account containing six Microsoft Word documents as attachments.  The attached Word files contained confidential business plans, internal best practices distributed to Roehl truck drivers in the normal course of business, and detailed compliance and training information relating to the performance of Stein's official duties as a fleet operations manager.

46.     At 7:31 p.m. CDT on August 28, 2016, sent another email to his personal Gmail account containing one Microsoft Word file and two Microsoft Excel spreadsheets as attachments.  The Word file is entitled, "Weekly Operations Meeting" and contains a detailed checklist used by fleet managers to track metrics such as revenue, driver retention, miles-per-gallon per driver, safety accidents, on-time delivers, toll road violations and other compliance matters.

47.     One of the Excel spreadsheets attached to this email contains extensive statistics tracking the retention and attrition of drivers for the last five years.  This spreadsheet details the losses of drivers by State, age and fleet, and also tracks the reason for each driver's departure. The other spreadsheet attached to the email is a "scorecard" that ranks Stein's fleet managers by "productivity points" and tracks several other metrics such as average revenue, on-time deliveries, miles logged by drivers and miles-per-gallon.  This spreadsheet also tracks these same metrics on a weekly basis going all the way back to 2011.

48.     Also at 7:31 p.m. CDT on August 28, 2016, Stein sent another email to his personal Gmail account containing four Microsoft Word files and two Microsoft Excel spreadsheets.  Included among the Microsoft Word files were Stein's resume and another

business plan update.  The Excel spreadsheets attached to this email collectively comprise more than 1,000 pages of confidential company data.  One spreadsheet contains detailed and up-to-date driver and equipment inventory information.  The other spreadsheet contains weekly paid-time off ("PTO") information for employees in Roehl's flat-bed division from the week of May 7, 2011 through August 27, 2016.

49.    On August 29, 2016—the day after Stein sent Roehl's confidential information to his personal email account—Stein resigned from the company, effective immediately.  Upon information and belief, after his resignation Stein immediately started working as a fleet operations manager for Omni.

50.    Immediately after Stein's resignation, Roehl's V.P. of Technology discovered the four emails Stein sent to himself by conducting a search of Stein's emails stored in the Barracuda archive.  Roehl's search of Stein's emails was conducted in the regular course of business.

51.    In sum, Stein surreptitiously compiled a treasure trove of confidential information and trade secrets which he was able to access by virtue of his role as Fleet Operations Manager.  There was no business reason or other rationale that necessitated Stein sending this information to his personal email account.  With the exception of Stein's resume, all of the files Stein sent to himself contained highly valuable, secret company data that was neither publicly available nor ascertainable.  In fact, such information was only accessible by senior-level employees like Stein who had the requisite credentials and passwords to access such information.

52.    Upon information and belief, Stein has disclosed the confidential information he stole from Roehl to Witt, and others, in the context of his employment with Omni.  Upon further information and belief, Stein will continue to use and disclose this information in the foreseeable future.

11

53.     The damage to Roehl's business resulting from Omni's use and disclosure of the confidential data stolen by Stein is significant.  The long-haul trucking business is an extremely competitive industry—especially with respect to the recruitment and retention of safe and reliable drivers.  Confidential company data such as lists of licensed drivers, performance and productivity figures and customer satisfaction records is a gold mine for a competitor.

54.     With Roehl's confidential driver metric data, driver information and operational methods at its fingertips, Omni—which just started operations—has the ability to develop a reliable, efficient workforce to unfairly compete with Roehl.  Omni can solicit drivers who formerly worked at Roehl; and it can identify the ones who were the most productive. Omni can poach Roehl's current drivers who have the best records.  In one fell swoop, Omni stole a great deal of information that it took Roehl years to fairly develop.

55.     Furthermore, Omni can use the data contained in the email attachments Stein sent to himself to develop benchmarks for tracking, *inter alia*, driver productivity, on-time deliveries, miles logged, miles-per-gallon, the fastest and most cost-efficient trucking routes throughout the country, and revenue figures. Essentially, Omni can use Roehl's confidential data to copy Roehl's successful operational platform—developed carefully by Roehl over the last fifty years—and also target for employment those drivers that Omni wants to staff its own fleet.  All at the expense of Roehl and abetted by a former Roehl employee.

56.     On September 2, 2016, counsel for Roehl sent letters to Stein and Witt reminding them of Stein's post-employment obligations to Roehl and requested written assurances that Stein and Omni intended to comply with those obligations.  The letter sent to Stein is attached hereto as Exhibit C; the letter sent to Witt is attached hereto as Exhibit D.

57.     Counsel for Omni responded on September 8, 2016.  Subsequently, counsel for Stein responded on September 14, 2016.   In both letters, counsel for Omni and Stein acknowledged that Stein is presently working for Omni as a fleet operations manager. Moreover, Stein's counsel confirmed that Stein copied several files from his Roehl computer and sent those files to his personal email account the evening prior to his resignation.

58.     Omni's response and Stein's response are attached hereto as Exhibits E and F, respectively.

59.     On September 21, 2016, counsel for Roehl sent a letter responding to Stein's counsel and another letter responding to Omni's counsel.   In each letter, Roehl's counsel requested that Stein and Omni agree to a set of conditions to protect the secrecy of the confidential information Stein misappropriated and to ensure that neither Stein nor Omni had used or disclosed the confidential information.

60.     The September 21, 2016 letter sent to Stein's counsel is attached hereto as Exhibit G; the September 21, 2016 letter sent to Omni's counsel is attached hereto as Exhibit H.

61.     On September 22, 2016, Roehl's counsel communicated telephonically with Omni's counsel regarding Roehl's most recent letter.  During this call, Omni's counsel refused to agree to any of the conditions requested by Roehl in its letter.

62.     On September 23, 2016, Roehl's counsel communicated telephonically with Stein's counsel regarding Roehl's most recent letter.  During this call, Stein's counsel also refused to agree to any of the conditions requested by Roehl in its letter.

## COUNT I

**Misappropriation of Trade Secrets**
**(Damages and Injunctive Relief)**
**Against All Defendants**

63.     Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

64.     The Wisconsin Uniform Trade Secrets Act, Wis. Stat. Ann. § 134.90, *et seq.* ("WUTSA"), forbids the actual and threatened misappropriation of trade secrets.   Under the WUTSA, "trade secret" means "information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply: (1) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; (2) The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances."  Wis. Stat. Ann. § 134.90(1)(c).

65.     Under the WUTSA, "misappropriation" means "(a) acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means; (b) disclosing or using without express or implied consent the trade secret of another if the person did any of the following: (1) used improper means to acquire knowledge of the trade secret; [or] (2) at the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means: deriving it from or through a person who utilized improper means to acquire it; acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use; deriving from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; [or] acquiring it by accident or mistake."  Wis. Stat. Ann. § 134.90(2).

66.     Under the WUTSA, "improper means" includes "espionage, theft, bribery, misrepresentation and breach or inducement of a breach of duty to maintain secrecy."  Wis. Stat. Ann. § 134.90(1)(a).

67.     Certain confidential and proprietary information of Roehl constitutes trade secrets under the WUTSA, including, but not limited to, computer-generated reports detailing business-related data metrics, methods of operation, driver lists, business plans or strategies, marketing plans, business processes and procedures, employee compensation and wage information, operational formulas and policies, and future business development plans.

68.     Roehl derives economic benefit from the that fact its trade secrets, including its computer-generated reports detailing business-related data metrics, methods of operation, driver lists, business plans or strategies, marketing plans, business processes and procedures, employee compensation and wage information, operational formulas and policies, and future business development plans, are not generally known to individuals or entities outside of Roehl.

69.     Roehl takes reasonable measures to protect its trade secrets.  These measures include password-protected databases, employee acknowledgments pledging not to disclose trade secret information, and limitations on dissemination of trade secret information to senior-level employees on a need-to-know basis.

70.     Stein knew he had a duty to maintain the secrecy and confidentiality of Roehl's trade secrets due, in part, to his Employee Acknowledgment form and his status as a Fleet Operations Manager.

71.     Omni is under a duty to not accept any misappropriated trade secrets, including Roehl's trade secrets, and Omni is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

72.     Defendants have used improper means to acquire, disclose and utilize Roehl's trade secrets without consent of any kind for their own financial gain.

73.     Stein will inevitably continue to disclose and utilize Roehl's trade secrets in the course of his employment with Omni in his role as a fleet operations manager for Omni.

74.     Omni has accepted and utilized Roehl's trade secrets for the purpose of improving its business operations, poaching Roehl's truck drivers and diverting business operations away from Roehl.  Omni continues to do so and poses a continuing threat to further misappropriate such trade secrets.

75.     Defendants' actions constitute actual and threatened misappropriation in violation of the WUTSA, and also constitute willful misappropriation.

76.     Roehl has suffered damages and irreparable harm as a result of Defendants' breach of the WUTSA, including diminution in the value of its trade secrets and an unfair reduction in its competitive advantage.

77.     Roehl is entitled to actual damages and punitive damages from Defendants, jointly and severally, and for attorneys' fees.

78.     Roehl's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to any compensatory relief.

79.     Defendants' actions will continue to cause irreparable harm and damages to Roehl and its trade secret information if not restrained.

## COUNT II

**Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.***
**(Injunctive Relief and Damages)**
**Against All Defendants**

80.     Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

81.     The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

82.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

83.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied

consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5).

84.     Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

85.     Certain confidential and proprietary information of Roehl constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including, but not limited to, its computer-generated reports detailing business-related data metrics, methods of operation, driver lists, business plans or strategies, marketing plans, business processes and procedures, employee compensation and wage information, operational formulas and policies, and future business development plans.

86.     Roehl derives economic value from the fact that its trade secrets, including its computer-generated reports detailing business-related data metrics, methods of operation, driver lists, business plans or strategies, marketing plans, business processes and procedures, employee

compensation and wage information, operational formulas and policies, and future business development plans, are not generally known to individuals or entities outside of Roehl.

87.    Roehl takes reasonable measures to protect the secrecy of such information. These measures include password-protected databases, employee acknowledgments pledging not to disclose trade secret information, and limitations on dissemination of trade secret information to senior-level employees on a need-to-know basis.

88.    Stein knew he had a duty to maintain the secrecy and confidentiality of Roehl's trade secrets due, in part, to his Employee Acknowledgment form and his status as a Fleet Operations Manager.

89.    Omni is under a duty to not accept any misappropriated trade secrets, including Roehl's trade secrets, and Omni is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

90.    Defendants have used improper means to acquire, disclose and utilize Roehl's trade secrets without consent of any kind for their own financial gain.

91.    Stein will inevitably continue to disclose and utilize Roehl's trade secrets in the course of his employment with Omni in his role as a fleet operations manager for Omni.

92.    Omni has accepted and utilized Roehl's trade secrets for the purpose of improving its business operations, poaching Roehl's truck drivers and diverting business operations away from Roehl.  Omni continues to do so and poses a continuing threat to further misappropriate such trade secrets.

93.    Defendants' actions constitute actual and threatened misappropriation in violation of the DTSA.

94.     Roehl has suffered damages and irreparable harm as a result of Defendants' breach of the DTSA, including diminution in the value of its trade secrets and an unfair reduction in its competitive advantage.

95.     Roehl is entitled to actual damages and punitive damages from Defendants, jointly and severally, and for attorneys' fees.

96.     Roehl's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to any compensatory relief.

97.     Defendants' actions will continue to cause irreparable harm and damages to Roehl and its trade secret information if not restrained.

### COUNT III

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.***
**(Injunctive Relief and Damages)**
**Against Stein**

98.     Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

99.     Roehl's internal computers and databases are used in interstate commerce.

100.     In violation of the Computer Fraud and Abuse Act ("CFAA"), Stein intentionally and deliberately accessed Roehl's computers and databases for the purpose of downloading and emailing himself confidential information from such computers and databases.  Further, Stein provided this confidential information to Omni in excess of his authorized access to the computers and databases.

101.     Stein was acting as an agent of Omni when he acted in excess of his authorized access to Roehl's computers and databases.

102.    Stein acted in a manner to misappropriation information, including trade secrets, from Omni's computers and databases for the purpose of benefiting himself and Omni, and for the purpose of harming and injuring Roehl.

103.    Stein's access in excess of his authorization has caused Roehl to suffer losses that are difficult, if not impossible, to quantify, but certainly amount to at least $5,000.

104.    Stein's actions threaten to or have caused Roehl irreparable harm in the form of diminution in the value of its confidential information and trade secrets.

105.    Stein's actions will continue to cause irreparable harm and damages to Roehl if not restrained.

**COUNT IV**

**Computer Crimes**
**(Injunctive Relief)**
**Against Stein**

106.    Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

107.    It is unlawful for any person to commit any of the following acts willfully, knowingly and without authorization: (i) access computer programs or supporting documentation; (ii) take possession of data, computer programs or supporting documentation; or (iii) copy data, computer programs or supporting documentation.  Wis. Stat. Ann. § 943.70(2)(a).

108.    Stein intentionally and deliberately access Roehl's computer programs and databases for the purpose of downloading and emailing himself confidential information from such computers and databases.  Further, Stein provided this confidential information to Omni in excess of his authorized access to the computers and databases.

109.    As a result of Stein's willful, knowing and unauthorized access and misappropriation of Roehl's computer-generated data, Roehl is entitled to injunctive relief to prevent or stop the disclosure of this information which may enable Omni or other persons to gain unauthorized access to Roehl's confidential data.

110.    Pursuant to Wis. Stat. Ann. § 943.70, Roehl is entitled to preliminary and permanent injunctions enjoining Stein, and anyone to whom he has divulged Roehl's information (including Omni) from making use of any of Roehl's information and ordering Stein and anyone to whom he has divulged Roehl's information, to return to Roehl all electronically-stored information as well as all documents and things that contain this information.

111.    Pursuant to Wis. Stat. Ann. § 943.70, Roehl is further entitled to preliminary and permanent injunctions enjoining Stein, any anyone to whom he has divulged Roehl's information (including Omni), from making any further use of Roehl's information, and to discontinue any activities designed or intended to use the information in competition with Roehl.

## COUNT V

**Breach of Duty of Loyalty**
**(Injunctive Relief and Damages)**
**Against Stein**

112.    Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

113.    As a Fleet Operations Manager, Stein was placed in an important position of trust and confidence with Roehl in which Roehl entrusted Stein with its trade secret and confidential information, including direct access to, *inter alia*, computer-generated reports detailing business-related data metrics, methods of operation, driver lists, business plans or strategies, marketing plans, business processes and procedures, employee compensation and wage information,

operational formulas and policies, and future business development plans—all of which are not generally known to individuals or entities outside of Roehl.

114.    Stein's official job duties and his unfettered access to Roehl's confidential and trade secret information were such that Roehl considered Stein a key employee who could cause serious and irreparable harm to Roehl as a result of his misuse of either his position of trust and confidence.

115.    By virtue of Stein's key position as a Fleet Operations Manager and his resultant job duties and responsibilities, Stein owed a fiduciary duty of loyalty to Roehl.

116.    Stein breached his duty of loyalty when he misappropriated confidential information and trade secrets on behalf of a competing entity, Omni, while he was still employed by Roehl.

117.    Upon information and belief, Stein further breached his duty of loyalty by disclosing misappropriated confidential information and trade secrets to Omni after he began working for Omni as a fleet operations manager.

118.    Roehl's damages resulting from Stein's breach of his duty of loyalty cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

119.    Stein's actions will continue to cause irreparable harm and damages to Roehl if not restrained.

## COUNT VI

**Civil Conspiracy**
**(Injunctive Relief and Damages)**
**Against All Defendants**

120.    Roehl realleges and incorporates by reference Paragraphs 1 through 62 as though fully set forth herein.

121.    Defendants acted in concert to commit various wrongful acts, including without limitation, the torts identified specifically in the preceding Counts.

122.    Defendants had a meeting of the minds on the course of action identified in the preceding Counts, including the theft, use and disclosure of Roehl's misappropriated confidential and trade secret information.

123.    Roehl's damages, including but not limited the diminution of the value of its trade secrets, cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

124.    Defendants' actions will continue to harm Roehl if not restrained.

## JURY DEMAND

Plaintiff hereby asserts its right to a trial by jury and demands a jury trial on all Counts so triable.  Plaintiff will tender any required jury fee.

## PRAYER FOR RELIEF

**WHEREFORE**, Roehl Transport, Inc. prays for judgment against Defendants, jointly and severally, as follows:

A.    All Defendants must, at all times henceforth, maintain the secrecy of all confidential information misappropriated by Stein prior to his resignation from Roehl, and never disclose such confidential information to any third party for any reason whatsoever;

B.      Defendants shall not use, disclose or misappropriate any of Roehl's trade secrets pursuant to the Wisconsin Uniform Trade Secrets Act and the Defend Trade Secrets Act;

C.      Defendants must turn over for inspection and review all personal and business computers, laptops, external hard drives, flash drives, external devices, tablets and phone for forensic review by a computer forensic expert of Roehl's choosing;

D.      Award to Roehl actual damages against Stein and Omni, jointly and severally, including compensatory, exemplary, consequential and/or restitutionary damages;

E.      Award to Roehl attorneys' fees under the Wisconsin Uniform Trade Secrets Act and the Defend Trade Secrets Act;

F.      Award to Roehl exemplary damages in an amount twice the amount of actual damages awarded, for willful and malicious misappropriation under the Wisconsin Uniform Trade Secrets Act and the Defend Trade Secrets Act; and

G.      Any additional relief this Court deems equitable and just.

Dated this 27th day of September, 2016.

Respectfully submitted,

  /s/ *David S. Almeida*

David S. Almeida (Wisconsin Bar No. 1086050)
Kevin M. Cloutier (*pro hac vice pending*)
David M. Poell (*pro hac vice pending*)
Shawn D. Fabian (*pro hac vice pending*)
Mikela T. Sutrina (*pro hac vice pending*)
**Sheppard Mullin Richter & Hampton LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300; Fax: (312) 499-6301

*Counsel for Plaintiff Roehl Transport, Inc.*